```
┌─────────────────────────────────────┐
│ USDC SDNY_____                  │
│ DOCUMENT_____                   │
│ ELECTRONICALLY                       │
│ FILED ___7/2/14_____               │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

FRANZ GOLDING,                            :

                  Petitioner,      :

      - against -                      :

UNITED STATES OF AMERICA,                 :

                  Respondent.      :

---------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
JED S. RAKOFF_____**

05cr538-JSR
11cv4243-JSR-FM

**FRANK MAAS**, United States Magistrate Judge.

I.     Introduction

          On June 28, 2008, after a two-week jury trial before Your Honor, petitioner

Franz Golding ("Golding") was convicted on all four counts in which he was named,

which charged him with conspiring to distribute and possess with intent to distribute 100

kilograms or more of marijuana (Count One); using firearms to commit a murder in

furtherance of that conspiracy (Count Two); carrying firearms during that conspiracy

(Count Three); and being an alien in possession of a firearm (Count Four).  Thereafter, on

September 22, 2008, Your Honor sentenced Golding to thirty-five years of imprisonment,

to be followed by three years of supervised release.

          Following the denial of his direct appeals, Golding filed a <u>pro se</u> motion

seeking to set aside his conviction pursuant to 28 U.S.C. § 2255 ("Section 2255").  In that

motion, Golding claims that he was denied the effective assistance of counsel, in violation

of the Sixth Amendment, because his trial counsel (a) failed to impeach a Government

witness properly at a pretrial suppression hearing; (b) prevented him from testifying on his own behalf during the pretrial suppression hearing and at trial; and (c) failed to advise him adequately concerning his sentencing exposure, thereby causing him to proceed to trial rather than pleading guilty.  (Civ. ECF No. 1 ("Petition" or "Pet.") at 6-7; Cr. ECF No. 135 ("Mem.") at 3-12; Golding Aff. ¶¶ 14, 20).[1]  Golding further maintains that his appellate counsel was ineffective for failing to raise his trial counsel's inadequacies on appeal.  (Mem. at 5-7).

For the reasons set forth below, the Petition should be denied.  Furthermore, because Golding has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

II.     Factual Background

   A.     Trial[2]

The Government's proof at trial would have enabled a reasonable juror to conclude as follows:

---

[1]     "Cr. ECF No." refers to docket entries in 05 Cr. 538.  "Civ. ECF No." refers to docket entries in 11 Civ. 4243, the related civil proceeding. "H1," "H2," and "H3" refer, respectively, to the transcripts of the pretrial hearings on June 7, July 20, and August 1, 2006. (Civ. ECF No. 11 (Resp't's Mem. in Opp. ("Opp. Mem.")), Exs. B, C, D).  "Dec." refers to the transcript of Judge Mukasey's decision following those hearings.  (Id., Ex. F). "Tr." refers to the trial transcript.  "S." refers to the transcript of Golding's sentencing.  (Cr. ECF No. 124). "Golding Aff." refers to the affidavit submitted by Golding in connection with his Petition.  (Pet. Attach. (Aff. of Franz Golding, sworn to on May 26, 2011)).

[2]     Because this case was tried before Your Honor, I have taken the liberty of not citing specific pages of the trial transcript in this section of my Report and Recommendation.

From late 2003 until early 2005, Shawn Peterkin ("Peterkin") ran a marijuana business in the Bronx.  He was assisted in this enterprise by numerous individuals, including Golding, Keino Simpson ("Simpson"), Omar Ken ("Ken"), Damian Brown ("Brown"), and Dwayne Palmer ("Palmer").

In 2005, Peterkin and Simpson had a disagreement concerning a quantity of marijuana for which Peterkin had not been paid.  As a consequence, in early April of that year, Simpson and Ken forced Peterkin into his home at gunpoint, attacked him and his family, and stole a large quantity of marijuana and nearly $50,000 in cash.  This, in turn, led to internecine warfare, including several shootouts involving Peterkin, Golding, Brown, and Palmer on one side, and Simpson and Ken on the other.

During the early morning of April 16, 2005, Peterkin, Brown, Golding, and Palmer were in Peterkin's silver Nissan Maxima when they began shooting at three vehicles driven by Simpson, Ken, and a man named David Reeves ("Reeves").  Peterkin, Brown, and Palmer were using handguns; Golding was using an AK-47 automatic rifle. During a subsequent chase, the occupants of the Maxima riddled Simpson's car with bullets, and he eventually crashed into a parked car.  Simpson died at a nearby hospital a little while later.

Immediately after the shooting, Peterkin, Brown, Palmer, and Golding fled across the George Washington Bridge to a motel ("Motel") in Fort Lee, New Jersey. Early the next morning, law enforcement officers arrested Peterkin, Golding, and Palmer, each in a different room at the Motel, and seized several firearms, including a loaded .40-

caliber Fratelli Tanfolio semi-automatic handgun found in Golding's room.  At the time

of his arrest, Golding had in his possession a ledger reflecting various drug transactions.

The officers executing the arrests also found shell casings in Peterkin's Nissan that had

been fired from an AK-47-type gun.

   The only eyewitness testimony concerning the Simpson murder came from

Ken.  He described the dispute between Peterkin and Simpson concerning marijuana,

admitted to robbing Peterkin's home and assaulting Peterkin and his family, and

described the violent confrontations that followed that incident.

   In particular, Ken testified that on April 16, 2005, he, Simpson, and Reeves

were in three separate cars parked near 219th Street and White Plains Road in the Bronx,

when Peterkin, Brown, Palmer, and Golding arrived in Peterkin's Nissan and began

shooting at them.  Golding was using an AK-47.  After the targets of the attack drove off

in their respective vehicles, a high speed chase ensued during which Peterkin, Brown,

Palmer, and Golding continued to fire.  At one point, after Ken stopped at a gas station,

Reeves called Ken's cell phone.  In response to Reeves' question, Ken indicated that

Peterkin, Brown, and Golding were the shooters; Reeves responded that they had killed

Simpson.

   A Government ballistics expert testified that ten bullets and shell casings

fired from an AK-47 were found at the crime scene, some of which matched those found

in Peterkin's vehicle, and that one of the bullets recovered from Simpson's body had been

fired from an AK-47-type rifle.  Another Government witness, Detective John Murray of

the New York City Police Department ("NYPD") ("Det. Murray"), testified that Golding made a statement at the Motel after waiving his <u>Miranda</u> rights.  In brief, Golding admitted his role in the shooting and the violent episodes that preceded it.  Golding also admitted that he and the others involved in the April 16 incident had used numerous firearms, including .40-caliber handguns, 9-millimeter handguns, and an AK-47 assault rifle.  Aaron Royes ("Royes"), one of Golding's fellow inmates, also testified that Golding admitted to him that "he killed a guy for robbing his friend" and that he had an AK-47 at the time of the murder.

George M. Goltzer, Esq., ("Mr. Goltzer") represented Golding in the District Court and on appeal.  Because the charges against Golding included the crime of murder, Judge Jones (to whom the case then was assigned) also appointed Frederick Cohn, Esq., to serve as "learned counsel."  (<u>See</u> Cr. ECF No. 80).  Although both defense counsel represented Golding through much of the proceedings, Golding's claims focus exclusively on Mr. Goltzer's representation.  (<u>See</u> Pet.; Mem.).  The defense strategy pursued by both attorneys was to argue that Simpson's murder was in no way related to a drug conspiracy.  Defense counsel thus argued that Simpson was not killed in retaliation for a robbery that undermined Peterkin's marijuana business, but as an act of personal revenge.  Counsel claimed that Simpson was killed because he and Ken had attacked Peterkin's family, duct-taped Peterkin's two-year old daughter to the bed, and sexually assaulted Peterkin's wife Rachel on the night of the robbery.

B.    <u>Verdict and Sentencing</u>

After a two-week trial and less than one full day of deliberations, the jury convicted Golding on all four counts in which he was named.  Thereafter, on September 22, 2008, Your Honor sentenced him to a term of thirty-five years in prison, to be followed by three years of supervised release.  (Cr. ECF No. 113; S. at 16).

C.    <u>Pre-Trial Suppression Hearing</u>

Prior to trial, Golding filed a motion to suppress the evidence seized from his person and Motel room on the date of his arrest, as well as his post-arrest statements to Det. Murray.  (Cr. ECF No. 20).  In that motion, Golding alleged that members of the New York/New Jersey Regional Fugitive Task Force ("Task Force Officers") had violated his Fourth, Fifth, and Sixth Amendment rights by entering his room at the Motel, seizing a handgun and ammunition located therein, and arresting him.  (<u>See</u> Cr. ECF No. 21).  Golding further contended that his post-arrest statements were not voluntary.  (<u>Id.</u> at 3).

In a supporting declaration, Golding stated that the Task Force Officers entered his Motel room without his permission, woke him up, and then held him down on the bed.  (Cr. ECF No. 22, Ex. 1 (Decl. of Franz Golding in Support of Motion to Suppress ("Golding Decl.")) ¶ 4).  He further asserted that he was "hit by a large cop, handcuffed, and held on the bed for what seemed like a long time."  (<u>Id.</u>).  According to Golding, he then was "taken into the hall and thrown on the floor," at which point Task Force Officers "threatened to hurt [him] if [he] did not tell them where to find [Peterkin]."

6

(Id.).  Golding conceded that he had signed a statement at the precinct indicating that he was read his Miranda rights, but claimed to have been "afraid not to answer the questions" because he "thought the police would hurt [him] if [he] did not cooperate." (Id.).

On June 7, July 20, and August 1, 2006, the Honorable Michael B. Mukasey, to whom Golding's criminal case then was assigned, held an evidentiary hearing to address the suppression motion filed by Golding and other such motions filed by his co-defendants.  (See H1-H3).  As Judge Mukasey noted, the primary issue in dispute was whether, at the time the arrests were effected, the Task Force Officers were aware of facts sufficient to form a reasonable belief that Peterkin, for whom the Government had an arrest warrant, would be found in either of the two Motel rooms that they first entered.  (Dec. at 11-12).

        1.    Government Case

The Government called six witnesses:  DEA Special Agent Eric Baldus ("Agent Baldus"), Det. Murray, NYPD Detectives Kevin Spellman ("Det. Spellman") and Robert Rodriguez ("Det. Rodriguez"), Sergeant John Lazzara ("Sgt. Lazzara") of the Passaic County Sheriff's Department, and United States Marshal Steven DePasquale ("Marshal DePasquale").  The testimony of these witnesses confirmed the following:

On April 16, 2005, a confidential informant told Agent Baldus that Peterkin and others had been involved in the Simpson homicide.  (H1 at 18).  Agent Baldus shared this information with Det. Rodriguez.  (Id. at 61-62).  At the time, Agent Baldus was

aware that Peterkin "was an illegal reentry into the United States" and a "large-scale marijuana dealer." (Id. at 19). That afternoon, Det. Rodriguez learned that there were several  outstanding warrants for Peterkin's arrest. (Id. at 63-71; see Resp't's Mem. of Law in Opp. to Mot. to Suppress ("Suppression Opp. Mem.")), Exs. D, E). The Task Force Officers also were aware that Peterkin had been driving a Nissan Maxima when the shooting occurred. (See H1 at 42; H3 at 261).

Det. Rodriguez called Det. Spellman, who ran searches for Peterkin in AutoTrack, a database used by law enforcement. (H3 at 226-30). Those searches identified the names Rachel Ellis, Rachel Ellis Peterkin, and Barbara Melvin as being associated with Peterkin. In particular, a vehicle registered to Peterkin's wife, Rachel Peterkin, was registered at 85 Washington Boulevard, Mount Vernon, New York, and that address also appeared on AutoTrack reports for Barbara Melvin and Rachel Ellis. (Id. at 236-37; see Suppression Opp. Mem., Ex. I). In addition, an AutoTrack report of potential aliases for Rachel Ellis included the names Rachel Peterkin and Rachel Melvin. (H3 at 238; see Suppression Opp. Mem., Ex. J).

That same day, Det. Rodriguez sought an order authorizing a pen register and the release of cell site information for Peterkin's cellular telephone. (H1 at 32-33, 75). After the state court approved that order, the Task Force obtained historical information indicating that, following the homicide, Peterkin's cell phone had traveled from the Bronx to Fort Lee, New Jersey, across the George Washington Bridge. (H1 at 34, 76-78). Furthermore, a call had been placed from Peterkin's cell phone to the Motel,

and the cell phone remained active in the Fort Lee area.  (Id. at 77-78, 116).  After

plotting the phone's approximate location, the Task Force Officers realized that the cell

phone was registering on the same face of a cell tower as it would if it were at the Motel.

(Id. at 78).  Det. Rodriguez and other Task Force Officers consequently drove to the

Motel.  (Id.).  When they arrived, NYPD detectives were unable to pinpoint the exact

location of Peterkin's cell phone.  (Id. at 85-86; H3 at 258-59).  Det. Rodriguez, however,

located a gray Nissan Maxima that matched the description of the vehicle used in the

homicide.  (H3 at 261).  He determined that the Nissan was registered to Barbara Melvin,

although that name did not yet mean anything to him.  (Id. at 261-62).

       Det. Rodriguez then showed the Motel manager a series of photographs,

including a photograph of Peterkin, but the manager did not recognize any of the

individuals depicted.  (Id. at 262).  Det. Rodriguez also collected several guest

registration cards from the Motel manager.  (Id. at 263-64).  When he subsequently

advised Det. Spellman that the Nissan in the Motel parking lot was registered to Barbara

Melvin, Det. Spellman responded that she might be the mother or a close relative of

Peterkin's wife, also known as Rachel Ellis, that the address on the vehicle registration

matched that of Rachel Ellis, and that Det. Spellman therefore was "good to go."  (Id. at

266-67).

       After hearing the name Rachel Ellis, Det. Rodriguez noted that Motel

rooms 106 and 107 had both been rented to a "Christopher Ellis," and that the Nissan was

parked within thirty feet of those rooms.  (Id. at 268-69, 293-94).  The Task Force

Officers then asked the Motel manager for a room register to determine which rooms were occupied and for a master key to unlock all the Motel rooms.  (H1 at 85).  They then began knocking on the doors of the occupied rooms, starting with room 105.  (Id.).  Golding and Palmer were arrested in and removed from rooms 106 and 107, respectively.  (Id. at 121).

Det. Murray, Sgt. Lazzara, and Marshal DePasquale told slightly differing accounts of the actual entry into Motel rooms 106 and 107.  Det. Murray, who watched the operation from approximately thirty feet away, recalled the doors to rooms 106 and 107 being forced open.  (H2 at 20-21).  Sgt. Lazarra could not recall whether the doors were forced or opened using keys obtained from Motel management.  (Id. at 32).  Marshal DePasquale recalled the Task Force Officers attempting to use a key, but ultimately forcing the door open.  (Id. at 52).  All of the Government's hearing witnesses who were present during the arrests agreed, however, that they did not threaten, or hear anyone else threaten, Golding.  (H2 at 9, 18-19, 33, 50; H3 at 292-93; see Dec. at 15).

2.      Defense Case

Golding did not testify at the suppression hearing.  (See Dec. at 15).

3.      Suppression Decision

Judge Mukasey denied all of the motions to suppress, concluding that the Task Force Officers had entered Motel rooms 106 and 107 lawfully, based on their reasonable belief that Peterkin had rented those rooms and would be found in one of them.  (Id. at 4, 12).  The Judge noted that, by the time of their entry, the Task Force

10

Officers knew that:  (a) Peterkin's cell phone had traveled from the Bronx to Fort Lee, where the Motel was located; (b) that cell phone had been used to call the Motel and still was being used in the vicinity of the Motel to make calls; (c) a silver Nissan Maxima matching the description of the vehicle involved in the murder was parked near rooms 106 and 107; (d) both rooms had been rented by a single individual on the date of the shooting; (e) the name Ellis, under which the rooms had been registered, appeared to be the "maiden name of a person closely associated with Peterkin, probably his wife"; (f) Barbara Melvin, the registered owner of the Nissan, appeared to be associated with Rachel Ellis Peterkin; and (g) the Nissan was registered at an address associated with Peterkin.  (Id. at 12).  As the Judge observed, the "likelihood that all those facts added up to a mere coincidence [was] infinites[s]imal."  (Id.).

Judge Mukasey further rejected Golding's argument that it was improper for the Task Force Officers to have entered both rooms at once since Peterkin arguably could only have been in one of the two rooms.  As Judge Mukasey explained, because the two rooms were adjoining, a decision to enter one before the other might have placed the Task Force Officers in unnecessary danger.  (Id. at 13-14).  The Judge also found that concern for the Task Force Officers' safety justified a security sweep of both rooms once they had entered.  (Id.).

Finally, the Judge rejected Golding's claim that the Task Force Officers should have sought a search warrant before entering the rooms.  The Judge reasoned that this was unnecessary given their "reasonable belief that Peterkin rented the rooms and was to be found within."  (Id. at 14).

11

Turning to Golding's post-arrest admissions, Judge Mukasey found that there was no basis for suppression due to the passage of time after the alleged threats and because Golding had waived his <u>Miranda</u> rights.  The Judge also found that there had been no threats.  (<u>Id.</u> at 15).

D.    <u>Subsequent Procedural History</u>

On appeal, Golding argued, <u>inter alia</u>, that (1) there was insufficient proof that Simpson was murdered during and in relation to the conspiracy to distribute marijuana charged in Count One, and (2) Your Honor improperly limited the scope of defense counsel's cross-examination of Det. Rodriguez at trial by precluding any questions about his disciplinary history.  Brief and Special Appendix for the Defendant-Appellant Franz Golding, <u>United States v. Brown</u>, 374 F. App'x 208 (2d Cir. 2010) (No. 08-4882(L)).  Despite these claims, on April 23, 2010, the Court of Appeals affirmed the convictions of Golding and his codefendants by summary order.  <u>Brown</u>, 374 F. App'x 208.  As to Golding's first contention, the court held that there was sufficient evidence for the jury to find that Simpson's murder and the marijuana conspiracy were related.  <u>Id.</u> at 209 ("The jury could have inferred that the purpose of the murder was to settle the dispute caused by the theft of drugs and drug proceeds" from Peterkin.).  Although the court did not specifically address Golding's second claim, it noted that it found "no merit in any of the appellants' remaining arguments."  <u>Id.</u> at 211.

On June 21, 2010, the Supreme Court denied Golding's petition for a writ of certiorari.  <u>Golding v. United States</u>, 130 S. Ct. 3487 (Mem.) (2010).  Thereafter, on June 1, 2011, Golding timely filed his Petition.

III.     Discussion

    A.     Standard of Review

The first sentence of Section 2255 provides that:

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).  Relief under that statute consequently may be based only on "constitutional error . . . or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). Among the reasons for circumscribing relief in this manner are "a respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place."  Id.

Section 2255 is "not a substitute for [a direct] appeal."  Rosario v. United States, 164 F.3d 729, 732 (2d Cir. 1998) (quoting United States v. Munoz, 143 F.3d 632, 637 (2d Cir. 1998)); Marone v. United States, 10 F.3d 65, 67 (2d Cir. 1993) (per curiam). Claims that could have been raised on direct appeal, but were not, therefore generally are unreviewable under Section 2255, unless the defendant can demonstrate either "cause for failing to raise the issue, and prejudice resulting therefrom" or "actual innocence."  Sapia v. United States, 433 F.3d 212, 217 (2d Cir. 2005) (quoting Rosario, 164 F.3d at 732).

One exception to this procedural bar relates to ineffective assistance of counsel claims, which need not be incorporated into a criminal defendant's direct appeal.

Massaro v. United States, 538 U.S. 500, 508-09 (2003).  As the Supreme Court has explained, because the trial judge is in the best position to assess the merits of an ineffective assistance claim, "a motion brought under [Section] 2255 is preferable to [a] direct appeal for deciding [such] claims."  Id. at 504.

Under Section 2255, a district court ordinarily must hold an evidentiary hearing before deciding the motion, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b). The Supreme Court has held that the statute "does not strip the district courts of all discretion to exercise their common sense" in deciding whether a hearing is warranted. Machibroda v. United States, 368 U.S. 487, 495 (1962).  The district courts retain the discretion to "choose a middle road" that avoids the delay, expenditure of resources, and false hope of a hearing.  Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001). Accordingly, district courts may employ other "methods . . . to expand the record without conducting a full-blown testimonial hearing," including, in some instances, relying on the submission of supplements to the record, such as affidavits.  Id. at 85-86.

B.    Ineffective Assistance of Counsel

In order to prevail on his ineffective assistance of counsel claims, Golding must demonstrate that (1) his counsel's performance "fell below an objective standard of reasonableness" and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 688-94 (1984).  Under Strickland, there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable

14

professional assistance." Id. at 689.  Therefore, Golding "must overcome the

presumption that, under the circumstances, the challenged action 'might be considered

sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  As the

Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of

habeas petitions that allege constitutionally ineffective counsel founder on that standard."

Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001).  Moreover, a court considering an

ineffectiveness claim need not "address both components of the [Strickland] inquiry if the

[petitioner] makes an insufficient showing on one."  Strickland, 466 U.S. at 697.

      In his Petition and Memorandum of Law, Golding claims that his counsel

provided constitutionally deficient representation in several ways.  None of these

assignments of error withstands scrutiny.

      1.    Failure to Impeach Detective Rodriguez at Suppression Hearing

      Golding's first claim is that Mr. Goltzer, his trial counsel, was ineffective in

cross-examining Det. Rodriguez at the pre-trial suppression hearing.  The constitutional

guarantee of effective assistance of counsel is, of course, not limited to the trial itself.

Thus, under the Sixth Amendment, criminal defendants are entitled to effective assistance

of counsel at pretrial hearings, just as they are at trial.  See, e.g., Hawthorne v.

Schneiderman, 695 F.3d 192, 195, 197 n.9 (2d Cir. 2012) (applying Strickland analysis to

claim of ineffective assistance at suppression hearing); Choullam v. United States, Nos.

05 Cr. 523, 10 Civ. 5257 (LTS), 2011 WL 3962601, at *2 (S.D.N.Y. Sept. 6, 2011)

(same).

Regardless of the forum, "[d]ecisions about the scope and manner of cross-examination are considered 'strategic in nature and generally will not support an ineffective assistance claim.'"  <u>Stallings v. Woods</u>, No. 04 CV 4714 (RLM), 2006 WL 842380, at *18 (E.D.N.Y. Mar. 27, 2006) (quoting <u>Dunham v. Travis</u>, 313 F.3d 724, 732 (2d Cir. 2002)).  Thus, courts generally should not second-guess how a cross-examination was conducted "unless counsel failed even to put on a defense, or to perform other basic elements of trial advocacy."  <u>Garcia v. Kuhlmann</u>, 897 F. Supp. 728, 730 (S.D.N.Y. 1995).

Golding contends that Mr. Goltzer should have impeached Det. Rodriguez's credibility by cross-examining him about adverse findings in two unrelated administrative hearings.  (Pet. at 6-7; Mem. at 3-8).  In the first of those hearings, an NYPD Assistant Deputy Commissioner ("ADC") found after a trial that Det. Rodriguez was guilty of, among other things, "wrongfully entering and searching [an] apartment" without a warrant.  (Opp. Mem. Ex. E at 3).  In the course of reaching that decision, the ADC declined to credit Det. Rodriguez's testimony that he had entered only the living room of the apartment during his visit.  (<u>Id.</u>).  In the second hearing, a different ADC found that Det. Rodriguez used coercion to secure an apartment occupant's "consent" for a search for a murder suspect.  (<u>Id.</u> at 4).

Golding contends that Mr. Goltzer should have used these findings to impeach Det. Rodriguez's hearing testimony regarding the circumstances surrounding his arrest and the seizure of the firearm found in his Motel room.  (<u>See</u> Pet. at 6; Mem. at 8).  Golding reasons that this might have caused Judge Mukasey to disbelieve Det.

16

Rodriguez's testimony, leading to suppression of both the firearm and Golding's post-arrest statement.  (Mem. at 7-8).  There is no basis for this claim.  Indeed, at the trial, Your Honor precluded any cross-examination regarding Det. Rodriguez's disciplinary proceedings because they were "of very, very limited probative value" and "likely to confuse and prejudice the jury," and that the "incidents themselves ha[d] no relevance to anything regarding his testimony."  (Tr. 204, 205).  This determination is equally applicable to the issues that were before Judge Mukasey at the suppression hearing.

a. <u>Threats at Time of Golding's Arrest</u>

Det. Rodriguez testified at the suppression hearing that he never threatened Golding in any way and never heard anyone else threaten him.  (H3 at 292-93).  Golding contends, however, that the Task Force Officers who arrested him "threatened to hurt [him] if [he] did not tell them where to find [Peterkin]," and that, although he was read his <u>Miranda</u> rights and signed a statement at the precinct, he "was afraid not to answer the questions" because he "thought the police would hurt [him] if [he] did not cooperate." (Golding Decl. ¶ 4).

Even if Mr. Goltzer could have undermined Det. Rodriguez's testimony that he did not threaten Golding by eliciting testimony about Det. Rodriguez's use of coercion in connection with a prior search, four other Government witnesses corroborated Det. Rodriguez's account.  In particular, Agent Baldus, Det. Murray, Sgt. Lazzara, and Marshal DePasquale all testified that they did not hear anyone threaten Golding.  (H2 at 9, 18, 33, 50; Dec. at 15).  In light of this testimony, Golding cannot show, as he must, that there is a reasonable probability that the outcome of the suppression hearing would

have been different had Mr. Goltzer cross-examined Det. Rodriguez concerning his

disciplinary history.  See Hayes v. Conway, No. 08-cv-5280 (ARR), 2010 WL 2921587,

at *12 (E.D.N.Y. July 19, 2010) (cross-examination of officer concerning inconsistencies

in his suppression hearing testimony would not have undermined officer's credibility

since it was corroborated by fellow officer's testimony).

       Moreover, as Judge Mukasey noted, Golding's statements "were made after

the passage of hours and after he had been informed specifically of his Miranda rights and

waived them."  (Dec. at 15).  Thus, even if Golding had been able to establish that one or

more Task Force Officers threatened him at the time of his arrest, his post-arrest

statements still would have been admissible.  See United States v. Williams, 681 F.3d 35,

45 (2d Cir. 2012) (reversing trial court's grant of suppression motion because "the near

two-hour passage of time between interviews" and the fact that defendant "knowingly and

voluntarily waived his right to remain silent" "belie[d] coercion" and were "highly

probative of voluntariness") (internal quotation marks omitted).  Golding therefore cannot

establish any prejudice.

       b.      Basis for Entry into Golding's Motel Room

       Golding contends that Mr. Goltzer also should have cross-examined Det.

Rodriguez concerning his disciplinary history in an effort to cast doubt upon his

testimony that the Task Force Officers used a key obtained from the Motel manager to

enter Golding's room, rather than breaking down the door.  The primary issue at the

suppression hearing, however, was not how the Task Force Officers entered the rooms,

but whether the preexisting arrest warrant for Peterkin, taken in combination with other

18

facts known to the Task Force Officers, gave them a reasonable belief that Peterkin would

be found in what eventually was determined to be Golding's room.  (See, e.g., Dec. at 11-

12).  In an attempt to show that the Task Force Officers could not reasonably have held

such a belief, Mr. Goltzer's cross-examination focused on the information known to the

officers prior to the date of Golding's arrest.  Specifically, through his questioning, Mr.

Goltzer established that:  (i) Peterkin had made a cell phone call to the Motel, but there

was no proof that the cell phone was at the Motel when the call was made (H1 at 93-99);

(ii) the Task Force Officers did not conduct any surveillance at other hotels located within

range of Peterkin's cell phone signals, nor did they check the license plates of cars parked

in nearby hotel parking lots (H3 at 277-78); (iii) the Motel manager could not identify

Peterkin in photographs; (iv) Det. Rodriguez did not recall asking the Motel manager any

questions about the guests in rooms 106 and 107 (id. at 284-88); and (v) the registration

cards for rooms 106 and 107 listed a guest whose name and address did not match any of

the individuals implicated in the homicide (id. at 279, 285).

        This approach to the cross-examination of Det. Rodriguez plainly was

reasonable.  If Mr. Goltzer had been able to establish that the Task Force Officers did not

have a basis to reasonably believe that Peterkin was the occupant of Golding's Motel

room, Judge Mukasey could have found that their entry into that room based solely on an

arrest warrant for Peterkin violated Golding's Fourth Amendment rights.  See, e.g.,

Steagald v. United States, 451 U.S. 204, 205-06 (1981) ("absent exigent circumstances or

consent," a law enforcement officer cannot "legally search for the subject of an arrest

warrant in the home of a third party without first obtaining a search warrant"); Stoner v.

California, 376 U.S. 483, 490 (1964) ("[A] guest in a hotel room is entitled to

constitutional protection against unreasonable searches and seizures."); United States v.

Lauter, 57 F.3d 212, 215 (2d Cir. 1995) (in determining whether officer may enter a

residence to effect an arrest warrant, "the proper inquiry is whether there is a reasonable

belief that the suspect resides at the place to be entered to execute an arrest warrant, and

whether the officers have reason to believe that the suspect is present") (emphasis in

original); United States v. Agapito, 620 F.2d 324, 331 (2d Cir. 1980) (citing Hoffa v.

United States, 385 U.S. 293, 301 (1966)) ("[O]ccupants of a hotel room are entitled to the

protection of the Fourth Amendment.").  In that event, both Golding's post-arrest

statements and the firearm seized from his room might have been suppressed as the fruit

of an unlawful entry.  See, e.g., United States v. Luckey, 701 F. Supp. 2d 464, 465, 477

(S.D.N.Y. 2009) (ammunition, narcotics, and statements suppressed because marshal

entered apartment without reasonable belief that fugitive named in arrest warrant resided

or was present there).  This carefully planned cross-examination strategy was consistent

with Mr. Goltzer's contention at the conclusion of the suppression hearing that "the police

had no right to make a warrantless entry into either [Golding's or Palmer's] room."  (H3

at 295).  Whether those rooms were entered with a key or through the use of force thus

was utterly irrelevant.[3]

---

[3]      It also bears mention that none of the other defense attorneys participating in the
suppression hearing raised the issue of Det. Rodriguez's prior disciplinary history on
cross-examination, despite having been apprised of it by the United States Attorney's Office.
(See Opp. Mem. Ex. E at 9).  All of their clients shared Golding's interest in establishing that the
Task Force Officers had entered the Motel rooms unlawfully.

Even if this Court were to assume that Mr. Goltzer's decision not to raise Det. Rodriguez's disciplinary history on cross-examination constituted ineffective assistance, Golding still would have to establish that he was prejudiced by this deficiency. Impeaching Det. Rodriguez, however, would have had no impact on the court's conclusion that the Task Force Officers entered Golding's Motel room lawfully. As an initial matter, it was undisputed that the Task Force Officers had an arrest warrant for Peterkin. (H2 at 64; H3 at 295-96). Thus, the sole issue to be decided at the hearing with respect to the entry of the rooms was whether the Task Force Officers were aware of facts sufficient to form a reasonable belief that Peterkin was present in the Motel room. (See Dec. at 12). As noted previously, Judge Mukasey found that the information that the Task Force Officers had acquired before entering Golding's room warranted that conclusion. (Id.). Although Det. Rodriguez provided much of the testimony regarding the Task Force Officers' investigation, his account was corroborated not only by Det. Spellman's testimony, but also by documentary evidence, including (i) an NYPD Property Clerk's Motor Vehicle Invoice and "Autotrack" report establishing that the Nissan Maxima was registered to Barbara Melvin and also was associated with Rachel Ellis Peterkin (Supp. Opp. Mem., Exs. T, J); (ii) registration cards for rooms 106 and 107 at the Motel under the name Christopher Ellis (see Suppression Opp. Mem., Ex. K); and (iii) Det. Rodriguez's contemporaneous handwritten notation from his conversation with Det. Spellman concerning the name Rachel Ellis (see H3 at 272-73).

Given this corroborative evidence, even a forceful attack on Det. Rodriguez's credibility likely would not have changed the outcome of the suppression hearing.  Golding consequently cannot establish prejudice.

c.     Firearm Found In Plain View

Finally, Golding faults Mr. Goltzer's failure to rely on the ADC's findings because they might have helped impeach Det. Rodriguez's testimony that the firearm recovered from Golding's motel room was in plain view.  (Pet. at 6).  This claim also is unavailing.  As the prosecutor noted, in their papers seeking a hearing the defendants did not contest that the firearms seized in the first two Motel rooms were found in plain view. (See, e.g., H2 at 64).  Indeed, Golding's declaration asserted only that he "was arrested for the gun that was found in [his] room."  (Golding Decl. ¶ 4).  This plainly was insufficient to raise a triable issue at the hearing as to whether the firearm was discovered in plain view.

Furthermore, although Det. Rodriguez testified about a weapon found in Peterkin's motel room, he did not say anything about the firearm recovered from Golding's motel room.  (See H1 at 79, 90-91, 139-44).  Accordingly, cross-examining Det. Rodriguez about his prior disciplinary history at the suppression hearing could not have had any impact on the Government's ability to introduce Golding's firearm into evidence at trial.  Moreover, because there was no issue at the suppression hearing as to whether the firearm in Golding's motel room was found in plain view, Mr. Goltzer's failure to cross-examine Det. Rodriguez concerning the administrative findings could not have prejudiced Golding as to this issue.

22

2.    Failure to Permit Golding to Testify on His Own Behalf

Golding next asserts that Mr. Goltzer was constitutionally ineffective because he prevented Golding from testifying on his own behalf both at the suppression hearing and at trial.  (Pet. at 7-8; Mem. at 9-12).  The Supreme Court has never expressly held that a criminal defendant has an absolute right to testify at a pretrial hearing. Hawthorne, 695 F.3d at 197 n.10.  At a trial, however, such a defendant "has the right to take the witness stand and to testify in his or her own defense."  Rock v. Arkansas, 483 U.S. 44, 49 (1987).  Trial counsel must advise a defendant with respect to the exercise of this constitutional right, but "the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter." Bennett v. United States, 663 F.3d 71, 84 (2d Cir. 2011) (quoting Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997)) (emphasis omitted); see Brown, 124 F.3d at 74, 77-78.

As part of his Petition, Golding submitted an affidavit in which he stated that Mr. Goltzer would not allow him to take the stand to testify that "[G]overnment witnesses were lying" about the events leading up to the shooting.  Golding further alleged that his testimony would have "given the jury a different perspe[c]tive" and shown that "[G]overnment witnesse[s], specifically, Omar Ken, had been commit[t]ing perjury[.]"  (Golding Aff. ¶¶ 15-18).  Mr. Goltzer disputes Golding's representations, stating in his own declaration that it is his "practice in every trial case" to inform his clients that it is their decision whether to testify and that they have "an absolute right to testify."  (Resp't's Mem. Ex. G (Decl. of George R. Goltzer, Esq., dated February 12, 2012 ("Goltzer Decl.")) ¶ 7).  Although Mr. Goltzer could not recall the exact words he

23

used to convey these thoughts due to "the passage of years," he stated that he told

Golding that he "had the right to testify" but "advised against it in the strongest terms."

(Id.).  Mr. Goltzer stated further that he explained to Golding "the problems he would

have on the stand," as well as the fact that the permissible scope of any cross-examination

would be broad.  (Id. at ¶ 9).  According to Mr. Goltzer, Golding accepted this advice and

decided not to testify.  (Id.).

         Although Golding has submitted an affidavit disputing Mr. Goltzer's

averments, his "self-serving and uncorroborated" account does not require that this Court

hold a hearing at which both witnesses would be called to testify.  See Rosario-

Dominguez v. United States, 353 F. Supp. 2d 500, 518 (S.D.N.Y. 2005).  Rather, the

Court may consider the merits of this aspect of Golding's ineffectiveness claim based on

the submitted documents.  See Chang, 250 F.3d at 85-86 (judge has discretion not to hold

full-blown evidentiary hearing where the "proffer involve[s] a generic claim – one that

can be, and is often, made in any case in which the defendant fails to testify – based

solely on his own highly self-serving and improbable assertions"); Faison v. McKinney,

No. 07 Civ. 8561 (JGK), 2009 WL 4729931, at *16 (S.D.N.Y. Dec. 10, 2009) ("When a

petitioner's affidavit alleging that his defense counsel denied him his right to testify is

'self-serving and uncorroborated' and defense counsel makes a sufficiently detailed and

credible affirmation to the contrary, a district court can deny a . . . § 2255 petition for

habeas relief without a hearing, because the petitioner has not shown that his counsel

made a serious error under Strickland's first prong.").

In his papers, Golding has provided the Court with only boilerplate, wholly uncorroborated assertions that he wished to testify. Although Mr. Goltzer does not recall, verbatim, the precise content of his conversations with Golding, this does not mean that the Court must credit Golding's averments. See Bennett v. United States, 663 F.3d 71, 86 (2d Cir. 2011) (citing Greiner v. Wells, 417 F.3d 305, 326 (2d Cir. 2005)) ("The fact that . . . neither attorney could remember the particular conversation in which he advised [petitioner] of his rights to testify and to decide whether to do so is hardly surprising, given that there were 'hundreds' of conversations with [petitioner] and that the hearing was held 10 years after . . . trial."). Given the lack of any independent evidence that Mr. Goltzer precluded Golding from testifying, rather than merely advising against it, Golding has failed to meet his burden to show that Mr. Goltzer failed to advise him of his right to testify or prevented him from exercising that right.

In any event, even if the Court were to accept the statements in Golding's affidavit, he has failed to show that he was prejudiced by Mr. Goltzer's alleged refusal to allow him to testify. As noted previously, had Golding testified at the hearing that he was threatened or physically assaulted by Task Force Officers at the time of his arrest, his testimony would have been contradicted by the testimony of five Government witnesses. (H2 at 9, 18, 33, 50; H3 at 292-93; see also Dec. at 15). Moreover, even if Judge Mukasey had accepted Golding's claim that the conditions surrounding his arrest were coercive, Golding's post-arrest statements still likely would not have been suppressed in view of the passage of time between the Task Force Officers' alleged threats and Golding's inculpatory statements, as well as his express waiver of his Miranda rights.

25

(See Dec. at 15).  Golding therefore is not entitled to any relief on the theory that he

improperly was denied the right to testify at the suppression hearing on his own behalf.

Turning to Golding's potential trial testimony, the Government presented

evidence that Golding had confessed on two separate occasions to participating in

Simpson's murder:  once to Det. Murray and once to Royes, his fellow inmate.

Furthermore, the jury was presented with substantial additional evidence of Golding's

guilt, including, but not limited to (a) a drug ledger found in his possession at the time of

his arrest, (b) the testimony of Ken and other cooperating witnesses that Golding

participated in Peterkin's marijuana business, (c) a "drug notebook" containing Golding's

name, and (d) Golding's possession of a loaded .40-caliber Fratelli Tanfolio semi-

automatic handgun at the time of his arrest.

Had Golding taken the stand at trial to tell his side of the story, he would

have been subjected to cross-examination, drawing even more attention to his two

confessions and the other evidence of his guilt.  Consequently, Golding's testimony

would have hurt – not helped – his chances of acquittal.  It follows that even if Mr.

Goltzer prevented Golding from testifying at trial, which seems highly unlikely, Golding

cannot show that he suffered any prejudice as a result.   See, e.g., Lindstadt, 239 F.3d at

204 ("Even serious errors by counsel do not warrant granting habeas relief where the

conviction is supported by overwhelming evidence of guilt."); Ozsusamlar v. United

States, Nos. 10 Civ. 3455, 05 Cr. 1077 (SAS), 2012 WL 4473286, at *6 (S.D.N.Y. Sept.

28, 2012) ("[G]iven the Government's evidence . . . [petitioner's] testimony would have

exposed him to a cross-examination that likely would have been more damaging to [his]

case than had he not testified at all."); Hales v. United States, No. 08 Civ. 6547 (LTS) (FM), 2010 WL 3156042, at *5 (S.D.N.Y. Aug. 9, 2010) (claim that movant was prejudiced because she did not testify and thus could not tell "her side of the story" was inadequate given substantial evidence of guilt). This aspect of his ineffective assistance claim consequently also does not entitle him to habeas relief. See, e.g., United States v. Caracappa, 614 F.3d 30, 48-49 (2d Cir. 2010); Rega v. United States, 263 F.3d 18, 21-26 (2d Cir. 2001); Brown, 124 F.3d 73, 80-81.

3.   Failure to Advise Golding About a Potential Plea

Finally, Golding contends that Mr. Goltzer provided ineffective assistance regarding the desirability of a guilty plea. Specifically, Golding alleges that Mr. Goltzer never advised him that he faced a potential life sentence if convicted. (Golding Aff. ¶ 14). Golding further avers that he "would have entertained and pleaded guilty to any reasonable offer by the Government" had Mr. Goltzer told him that he was facing a life sentence.[4] (Id.). In response, Mr. Goltzer states in his declaration that he "clearly advised" Golding, both privately and at a joint defense meeting, that he faced a possible sentence of life without parole. (Goltzer Decl. ¶ 5). Mr. Goltzer also states that he informed Golding that the Government had offered "a resolution with a suggested sentence of 27 years," but, despite Mr. Goltzer's advice, Golding decided to go to trial. (Id. ¶ 6).

---

[4]       In another paragraph in the same affirmation, however, Golding states that he "would have entertained and possibly pleaded guilty to a reasonable offer." (Id. ¶ 20) (emphasis added).

The _Strickland_ test also applies to allegations of ineffectiveness arising out of the process of plea bargaining.  _See_ _Purdy v. United States_, 208 F.3d 41, 44-49 (2d Cir. 2000); _Hill v. Lockhart_, 474 U.S. 52, 56-57 (1985).  Consequently, to prevail on such a claim, in addition to establishing that defense counsel's advice concerning sentencing exposure or a potential plea was objectively unreasonable, a petitioner must "demonstrate a reasonable probability that but for counsel's deficient performance, he would have pled guilty instead of going to trial."  _Raysor_, 647 F.3d at 495 (citing _Purdy_, 208 F.3d at 49; _Cullen v. United States_, 194 F.3d 401, 405 (2d Cir. 1999)).

Here, because the murder charge was a potential capital offense, on January 9, 2007, Judge Jones appointed Frederick H. Cohn, Esq., as "learned counsel" to assist Mr. Goltzer with Golding's defense.  (_See_ Cr. ECF No. 80, docket entry for Jan. 9, 2007; Goltzer Decl. ¶ 3).  Indeed, as late as February 29, 2008, the Government continued to seek the death penalty.  (Cr. ECF No. 51).  Golding was present in court on numerous occasions during which the death penalty issue was discussed.  (_See, e.g._, Cr. ECF docket entries for June 1, 2007, Sept. 21, 2007).  It also was not until some time after February 2008 that the "Attorney General declined to authorize a capital prosecution."  (Goltzer Decl. ¶ 3).  According to reimbursement forms submitted to this Court, Mr. Cohn served through trial and sentencing, and in that time spent more than twenty-two hours in "interviews and conferences" with Golding.[5]  By claiming ignorance of his sentencing exposure, Golding is, in effect, asserting that _both_ Mr. Goltzer and Mr. Cohn failed to

---

[5]        The Court can take judicial notice of these forms.  _See_ Fed. R. Evid. 201(b).

advise him of the possible maximum sentence, even during a period in which he faced a possible death sentence.  This defies credulity, especially in light of Mr. Goltzer's clear averment that he did, in fact, advise Golding that he faced life imprisonment, not just privately, but in a joint defense meeting.  (Goltzer Decl. ¶ 5).

Even if the Court were to assume that both of Golding's attorneys failed to advise him of the maximum potential sentence, Golding has not made out a colorable claim of resulting prejudice.  Accordingly, the Court need not hold a hearing on this issue. See Chang, 250 F.3d at 84.  To satisfy the prejudice prong of the Strickland standard, a petitioner must proffer some "objective evidence" that he would have accepted a plea offer.  United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998).  The record in this case is devoid of any such objective evidence.  In his Petition and supporting materials, Golding has not denied that Mr. Goltzer informed him that the prosecutor had offered a plea deal "with a suggested sentence of 27 years."  (See Goltzer Decl. ¶ 6).  Golding also does not deny that Mr. Goltzer counseled strongly in favor of accepting that offer.  (See id.).  At best, Golding has presented only his own self-serving and noncommittal declaration that he "would" have pleaded guilty to a "reasonable offer."  (Golding Aff. ¶¶ 14, 20).  That statement does not suffice to show that, had he been aware of his full sentencing exposure, Golding would have accepted the plea bargain exposing him to twenty-seven years in jail, or that he could have negotiated a better deal that would have caused him to plead guilty.  See United States v. Perez Gomez, 3:98CR109(JBA), 2003 WL 22119123 (D. Conn. Aug. 29, 2003) (quoting Mask v. McGinnis, 233 F.3d 132, 141

(2d Cir. 2000)) (petitioner's failure to make "sufficiently affirmative statement" that he would have taken plea offer was fatal to claim).

Courts in this Circuit have held that evidence of a great disparity between a defendant's sentence at trial and a plea offer, in conjunction with a petitioner's statement regarding his intentions to plead, can constitute some objective evidence to support a finding of prejudice.  See Carrion v. Smith, 365 F. App'x 278, 282 (2d Cir. 2010); Pham v. United States, 317 F.3d 178, 183 (2d Cir. 2003).  Here, although Golding faced a maximum sentence of life imprisonment at trial, he ultimately was sentenced to only thirty-five years.  This amounts to a difference of ninety-six months, only a small percentage of the time offered in the plea deal and the sentence Golding ultimately received.  This is not such a substantial disparity that it overrides the lack of any other objective evidence.  See Vasquez v. United States, 733 F. Supp. 2d 452, 460-61 (S.D.N.Y. 2010) (collecting cases).  Furthermore, as noted above, Golding's statements regarding his intentions are singularly equivocal.  Thus, even if the disparity in this case were "substantial," that evidence alone would not be enough to support a finding of prejudice.  See Gordon, 156 F.3d at 381.

Golding therefore has not satisfied the second prong of the Strickland test. His claim that he received ineffective assistance with respect to a potential guilty plea consequently should be denied.

4.    Ineffective Assistance of Appellate Counsel

Golding's final claim is that his appellate counsel was ineffective because he failed to raise on appeal Mr. Goltzer's alleged ineffectiveness at trial.  (Mem. at 6-7).

The Strickland test "applies to the evaluation of appellate counsel as well as trial counsel." Frederick v. Warden, Lewisburg Corr. Facility, 308 F.3d 192, 197 (2d Cir. 2002). For the reasons set forth above, all of Golding's ineffective assistance of trial counsel claims are meritless. Consequently, Golding's appellate counsel could not have been ineffective merely because he declined to raise these nonmeritorious claims as part of Golding's direct appeal. See Lewin v. Ercole, No. 05 Civ. 10339 (BSJ) (MHD), 2012 WL 2512016, at *8 (S.D.N.Y. June 28, 2012) ("Since the Court has found that Petitioner's Sixth Amendment claim regarding his trial counsel's performance is meritless, Petitioner's appellate counsel cannot be found ineffective for choosing not to pursue this claim on appeal."); Feliciano v. United States, Nos. 01 Civ. 9398, 95 Cr. 941 (PKL), 2004 WL 1781005, at *8 (S.D.N.Y. Aug. 10, 2004) ("Because petitioner's ineffective assistance claim is without merit, counsel's decision not to pursue the claim on appeal was certainly not an omission of a significant issue.").

IV.   Conclusion

For the foregoing reasons, the Court should deny Golding's Petition. Furthermore, because Golding has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c), a certificate of appealability should not issue.

V.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within fourteen days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the

Honorable Jed S. Rakoff, United States District Judge, and to the chambers of the

undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007,

and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

Any requests for an extension of time for filing objections must be directed to Judge

Rakoff.  Any failure to file timely objections will result in a waiver of those objections for

purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(d), 72(b).

Dated:        New York, New York
              July 2, 2014

                                        FRANK MAAS
                                United States Magistrate Judge


Copies to:

Honorable Jed S. Rakoff
United States District Judge

Franz Golding
# 57696-054
FCI Edgefield
Federal Correctional Institution
P.O. Box 725
Edgefield, South Carolina 29824

Jessica A. Masella
Assistant United States Attorney
(via ECF)